UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GILBERT P. MUNOZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **No: 05 C 1066** |
| | ) | **Judge John W. Darrah** |
| CBS BROADCASTING, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The Plaintiff, Gilbert Munoz, initiated this lawsuit after his termination from CBS

Broadcasting, Inc. (Def.'s 56.1 ¶ 73). The Plaintiff's one-count Complaint alleged that the

Plaintiff was discriminated on the basis of his age in violation of the Age Discrimination in

Employment Act ("ADEA"), as amended, 29 U.S.C. § 621 *et seq.* (Def.'s 56.1 ¶ 73). Currently

before the Court is Defendant's Motion for Summary Judgment.

## <u>FACTS</u>

The Plaintiff worked as a technician in the media room at CBS in Chicago, commonly

known as WBBM-TV, continuously from 1981 until his termination in January 2005. (Def.'s

56.1 ¶ 1; Pl.'s 56.1(a)(3) ¶ 78). At the time of the Plaintiff's termination, he was 56 years old.

(Def.'s 56.1 ¶ 4).

As a technician, the Plaintiff's job was to take in feeds of shows, sporting events, and

commercials that were going to air and enter them into the station's server. (Def.'s 56.1 ¶ 2).

1

There were over a dozen technicians at CBS, some of whom were older and some younger than the Plaintiff. (Def.'s 56.1 ¶ 3, 5). The Plaintiff reported to Tom Schnecke, the Vice President of Broadcast Engineering (47 years old), and Corrice Collins, the Station Operations Manager (62 years old). (Def.'s 56.1 ¶ 6).

## Management Changes at CBS

In 2003, a management change occurred at CBS. Joe Ahern took over management of the Chicago station as President and General Manager. (Def.'s 56.1 ¶ 7). After Ahern became the President and General Manager, a number of changes were established. Management instituted a "zero tolerance" policy with respect to technical mistakes made by its technicians, as a result of which at least one technician was fired. (Def.'s 56.1 ¶ 8). Further, additional security measures were instituted. (Def.'s 56.1 ¶ 8).

Significant personnel changes were also made with respect to technicians, on-air personnel, and management. (Def.'s 56.1 ¶ 9). In March of 2004, every qualified technician was offered a buy-out. (Def.'s 56.1 ¶ 10). Of the 50 to 55 technicians to whom it was offered, only three or four technicians accepted the buy-out. (Def.'s 56.1 ¶ 10). The Plaintiff initially decided that he wanted to take the buy-out but later changed his mind and stayed at CBS. (Def.'s 56.1 ¶ 11).

In addition, substantial shift changes were made in November 2004, which resulted in bitterness among some CBS technicians. (Def.'s 56.1 ¶¶ 12-13). As a result of the changes, there were generally fewer technicians assigned to most shifts and less opportunities for overtime. (Def.'s 56.1 ¶ 14). Prior to the shift change, the Plaintiff worked at least two days a

2

week from 11:00 a.m. to 7:00 p.m. and the remainder of the work days from 3:00 p.m. to 11:00 p.m., which, before the shift change, was known as the "night shift." (Pl.'s 56.1(a)(3) ¶ 94). After the changes, the Plaintiff's shift was altered so that he worked 11:30 p.m. to 7:30 a.m. five days per week. (Def.'s 56.1 ¶ 15).

Like many of the technicians, the Plaintiff was unhappy with the shift change. (Def.'s 56.1 ¶ 16). The Plaintiff complained to his direct supervisor, Corrice Collins, about the shift change and requested an earlier shift. (Def.'s 56.1 ¶ 17). The Plaintiff believed he should have an earlier shift because he had been at CBS longer than some other technicians. Collins told the Plaintiff to speak with Tom Schnecke (Collins' supervisor) about the shift change, but the Plaintiff did not speak with Schnecke because he "figured that it would not do any good." (Def.'s 56.1 ¶ 19). Under the union contract, a technician's seniority was not required to be considered when determining shifts. (Def.'s 56.1 ¶¶ 17-18).

Technicians younger than the Plaintiff were also unhappy with the shift changes. Pam Moralde, who, according to the Plaintiff, was in her late 30s or early 40s was transferred out of the night shift. Moralde was particularly unhappy about the shift changes because it interfered with her ability to take care of her children. (Def.'s 56.1 ¶ 20; Pl.'s 56.1(a)(3) ¶ 97). Following the Plaintiff's suspension and termination, Moralde was transferred back to the night shift. (Pl.'s 56.1(a)(3) ¶ 97).

### *The Plaintiff's Job Performance*

The supervisors at CBS reviewed the work of the technicians, like the Plaintiff. The supervisor of the technicians, Corrice Collins, would be informed *via* email every time a

3

technician missed a feed, failed to make a dub, or anytime something was missed. (Def.'s 56.1 ¶ 24). Collins kept these emails in a file on his computer called "Missed Feeds and Problems in the Media Room." (Def.'s 56.1 ¶ 25). Collins' computer contained eighteen emails related to the Plaintiff. (Pl.'s Resp. to Def.'s 56.1 ¶¶ 26-27). These emails stated that several feeds of major programs were missed by the Plaintiff. (Def.'s 56.1 ¶ 28). In response to an email sent to Collins because of a mistake made on the Plaintiff's shift, a technician stated, "This is not the first time we've had trouble with the sports recordings in the 6-7 p.m. timeframe." (Def.'s 56.1 ¶ 29). An email was sent to Collins by another technician entitled, "another messed up sports recording." (Def.'s 56.1 ¶ 30). Another technician stated, "This is the second sports recording that Gil blew for us today." (Def.'s 56.1 ¶ 30). One email stated "Gil blew bits and pieces of three sports recordings yesterday." (Def.'s 56.1 ¶ 30).

During this time period, the Plaintiff's supervisors referred to his work as "unacceptable" and "beyond unacceptable." (Def.'s 56.1 ¶ 31). One email sent from Collins referred to the Plaintiff's "failure to do his job" and "his serious lack of attention to his job." (Def.'s 56.1 ¶ 32). The file does not contain any emails regarding the Plaintiff's performance in January 2004, August 2004, September 2004, November 2004, or December 2004. (Pl.'s 56.1(a)(3) ¶ 82).

### *The Plaintiff's History with a Semi-Automatic Uzi Submachine Gun*

The Plaintiff purchased a semi-automatic Uzi submachine gun in 1983 or 1984 from a co-worker at CBS. (Def.'s 56.1 ¶ 38). During the 1980s, other co-workers became aware that the Plaintiff owned the Uzi submachine gun because CBS reporter, John Drummond, asked the

4

Plaintiff to bring the Uzi to work for use as a prop in a story on gun control, which the Plaintiff did. (Def.'s 56.1 ¶ 39-40).

Collins testified that the Plaintiff had been cautioned by CBS management against making threats about his Uzi. (Pl.'s 56.1, Exhibit E at 35-37). Thomas Bryant, a supervisor at CBS, testified that five or ten years before his termination, the Plaintiff blurted out that he felt like "going postal" during the middle of a sensitivity training session at work and that the training session instructor informed management that they need to "deal" with the Plaintiff. (Pl.'s 56.1, Exhibit C at 64-65).

### Alleged Threats

Linda Peltier, a CBS technician, testified that the Plaintiff, on two occasions within Peltier's first eight months of employment, mentioned bringing an Uzi to work and a desire to shoot people. (Pl.'s 56.1(a)(3) ¶ 107). On Saturday, January 1, 2005, Peltier on sent an email to Collins that stated:

> [I] thought you should know what Gil Munoz had repeated to me last Sunday, December 26th. Gil mentioned that he could "come in to work with an uzie [sic] and go postal." He has mentioned this to me on at least 2 other occasions. More recently, he has mentioned this in anger due to his recent schedule change. It's difficult for me to know the seriousness of his comments. Of course, I would hope that it is just a comment made in anger, without consequences. In any event, the company should be aware of comments made by individuals of this nature.

(Def.'s 56.1 ¶ 41; Pl.'s 56.1(a)(3) ¶ 107).

Peltier also apprised Bryant of the Plaintiff's alleged threats. (Pl.'s 56.1 (a)(3) ¶ 111). Collins gave Peltier's email to his supervisor, Tom Schnecke. (Def.'s 56.1 ¶ 42). Schnecke forwarded the email to other members of senior management at CBS. (Def.'s 56.1 ¶ 43). Collins

testified that he and Schnecke met on January 3, 2005, to discuss the email. (Pl.'s 56.1(a)(3) ¶ 113). Collins testified that he and Schnecke agreed that the behavior was "unacceptable." (Def.'s 56.1 ¶ 44). Tom Schnecke contacted Fran Preston (the Vice President and Program Director of WBBM-TV) to advise her of the details of the Plaintiff's alleged threat. (Pl.'s 56.1(a)(3) ¶ 112).

### Investigation into Alleged Threats

After receiving Peltier's email, CBS management conducted an investigation into the Plaintiff's apparent threat to bring a gun to work and "go postal." (Def.'s 56.1 ¶ 45). Schnecke and Preston, interviewed the Plaintiff's co-workers and supervisors. (Def.'s 56.1 ¶ 46). When Preston began her investigation, Preston asked the CBS Controller how long the Plaintiff had worked at CBS. (Pl.'s 56.1(a)(3) ¶ 118). Preston was told that the Plaintiff had worked for CBS for more than twenty-five years and that the Plaintiff was then fifty-six years old. (Pl.'s 56.1(a)(3) ¶ 118).

Preston and Schnecke interviewed seven of the Plaintiff's coworkers: Sandy Newcomb, Bob Chesney, Al Barcena, Howard Florence, Jim Knowlton, Mike Wilken (the assistant director of engineering), and Thomas Bryant. Fran Preston testified that the interviews lasted approximately five to ten minutes each. (Pl.'s 56.1(a)(3) ¶ 119). Preston testified that neither Newcomb, Chesney, Barcena, Florence, nor Bryant told Preston that the Plaintiff owned an Uzi. (Pl.'s 56.1(a)(3) ¶ 120). Preston testified that neither Barcena nor Florence heard the Plaintiff make any type of threat. (Pl.'s 56.1(a)(3) ¶ 120). Schnecke and Preston emailed a summary of

6

the information learned from their investigation to members of CBS management. (Def.'s 56.1 ¶ 48). The summary reported the coworkers' interviews as follows:

- Sandy Newcomb, one of the Plaintiff's coworkers, said that the Plaintiff said "he's going to get a gun and shoot them all" over the years that she has worked with the Plaintiff. (Def.'s 56.1 ¶ 49).

- Another coworker, Bob Chesney was "visibly rattled" when he spoke about the Plaintiff and said that "people are uncomfortable" because of the threats. (Def.'s 56.1 ¶ 51; Pl.'s 56.1(a)(3) ¶ 124). Chesney states: "Hasn't heard anything first hand, but the rumor is that Gil says 'I'm going to come in with an uzi . . . .'" (Pl.'s 56.1(a)(3) ¶ 124). With respect to Chesney's second conversation with Schnecke (on January 6, 2005), the summary said: "MAYBE after all these years, [Chesney] felt desensitized to outrageous remarks and he probably just learned to tune them out." (Pl.'s 56.1(a)(3) ¶ 127) (emphasis in original).

- Al Barcena noted that the Plaintiff is "high strung" and "gets aggravated easily" but that Barcena "[n]ever heard him make threats." (Pl.'s 56.1(a)(3) ¶ 128).

- Howard Florence stated that he "[n]ever heard anything" and "didn't know what Preston and Schnecke were talking about" but that he "knows there have been issues in the past but hasn't heard anything about this." (Def.'s 56.1 Ex. E).

- Coworker Jim Knowlton said that the Plaintiff has felt that CBS was "out to screw him" for the past five years. Knowlton also said that it is "understood by everyone" that the Plaintiff has an automatic weapon and even that there was a running joke with the Plaintiff about the Plaintiff's bringing his Uzi to work and

7

"going postal." (Def.'s 56.1 ¶ 52). Preston and Schnecke's interview summary states that Knowlton "has a running joke with Gil when he says 'he's going to get his uzi and go postal.' Knowlton says 'I hope you use selective fire.'" (Pl.'s 56.1(a)(3) ¶ 129). He also said that "he knows that in today's climate, you can't say things like this but [the Plaintiff] does."[1]

- Mike Wilken, the assistant director of engineering, said "in 1987 (when Mike was a tech), Gil said 'I'm going to bring in my uzi and blow them all away.'" Mike said that Gil was "referring to Chuck Upton, then the director of engineering, who had taken Gil off the street as a minicam driver and put him in the media room."

- Thomas Bryant, one of the Plaintiff's supervisors, told Preston and Schnecke that the Plaintiff told Bryant, "someone probably heard me say I was bringing a weapon down." (Def.'s 56.1 ¶ 54).

Preston never interviewed Corrice Collins or Don Johnson. (Pl.'s 56.1(a)(3) ¶¶ 130, 132). Johnson testified that he never heard the Plaintiff threaten to bring in an Uzi or any other weapon or threaten to "go postal." (Pl.'s 56.1(a)(3) ¶ 132).

In the course of the investigation, Thomas Bryant sent Corrice Collins an email on January 5, 2005, regarding the Plaintiff's mental state. The email stated that, over the previous four years, Bryant noted "something of a change in attitude" with the Plaintiff. (Def.'s 56.1 ¶

---

[1] Several weeks prior to the Plaintiff's termination, Knowlton made the statement, "I wish I could borrow your Uzi and bring it in and kill management," to which the Plaintiff responded, "I know you're just kidding, but the way things are now, don't repeat that to anybody else." (Pl.'s 56.1(a)(3) ¶ 129).

55). According to Bryant, the Plaintiff "became more depressed over the years," with 2004 being particularly bad and that the Plaintiff's "emotional state has gone downhill faster and faster . . . to the point that every problem that happens at work, he personally blames the TVTO Dept., namely the Managers." (Def.'s 56.1 ¶ 56). Bryant further testified that he witnessed the Plaintiff's crying, shaking, and trembling on multiple occasions. (Pl.'s 56.1, Exhibit C at 77). Bryant also testified that within the past year, he had seen the Plaintiff's crying at work more than any other time. (Pl.'s 56.1, Exhibit C at 77). Bryant testified that the Plaintiff admitted that he made a comment about "bringing a weapon down" in the control room. (Pl.'s 56.1, Exhibit C at 70-71).

### *Suspension and Termination of the Plaintiff*

On January 6, 2005, after the interviews with the Plaintiff's coworkers, Schnecke and Preston telephoned the Plaintiff and informed him that he was suspended until the investigation regarding the allegations that the Plaintiff was threatening to bring a gun to work was complete. (Def.'s 56.1 ¶ 62; Pl.'s 56.1(a)(3) ¶ 135).

The Plaintiff testified that during the phone conversation on January 6, 2005, Preston inquired whether the Plaintiff ever threatened to bring an Uzi to work in Peltier's presence. (Pl.'s 56.1(a)(3) ¶ 117). During this telephone conversation, the Plaintiff denied making the threat. (Def.'s 56.1 ¶ 63). During this telephone conversation, Preston asked the Plaintiff if he owned an Uzi or a gun. (Pl.'s 56.1(a)(3) ¶ 137). Preston testified that the Plaintiff denied owning such weapons; the Plaintiff testified that he never denied owning an Uzi to Preston. (Pl.'s 56.1(a)(3) ¶ 137).

9

Schnecke's written summary of this conversation, forwarded to Preston, states that when Schnecke advised the Plaintiff of his alleged threat to bring an Uzi to work with the purpose of harming employees, the Plaintiff denied that he made a threat, responding, "I've never brought a gun to work." (Def.'s 56.1 ¶ 63; Pl.'s 56.1(a)(3) ¶ 135). Schnecke's summary also states that he advised the Plaintiff that there would be an opportunity to provide the Plaintiff's side of the story in a "formal meeting" but that he was banned from the building until further notice. (Pl.'s 56.1(a)(3) ¶ 135).

Following this telephone exchange, Corrice Collins forwarded an email to the security office at CBS regarding the Plaintiff, which read, "*Do not allow Gil Munoz in this building under any circumstances for any reason.* Munoz has been taken out of the system and *is not to enter this building for any reason* until Tom Schnecke says it can be done." (Def.'s 56.1 ¶ 65) (emphasis in original).

CBS management also met to discuss the Plaintiff. (Def.'s 56.1 ¶ 66). In a January 5, 2005 email, Tom Schnecke referred to an incident five years prior in which the Plaintiff threatened to bring an Uzi to work. (Def.'s 56.1 ¶ 67). In response, Fran Preston expressed displeasure; she wrote, "This is unconscionable and a good part of the reason that we have so many employees here that feel they can get away with saying and doing anything, with no recourse." (Def.'s 56.1 ¶ 69).

Following the discussions with management, Fran Preston wrote a letter to the Plaintiff informing him of his immediate termination from CBS. (Def.'s 56.1 ¶ 70). The letter stated:

> CBS2 has concluded its investigation into the allegations that you threatened to bring a gun into the workplace. Although you have denied making such statements, the weight of the evidence establishes to my satisfaction that you did

10

make such statements on repeated occasions. I cannot tolerate such threats to the well-being of the CBS2 staff. Accordingly, your employment is hereby terminated. Because you were warned against making such statements, your failure to respond positively to that warning amounts to gross insubordination. Under the terms of the IBEW/CBS National Agreement, you are not entitled to severance pay.

(Def.'s 56.1 ¶ 70). The decision to terminate the Plaintiff's employment was based solely on

the alleged threat to bring a gun to the workplace. (Pl.'s 56.1(a)(3) ¶ 139). Preston was unaware

of any contention that the Plaintiff was performing in his position at a level inferior to that of

other technicians. (Pl.'s 56.1(a)(3) ¶ 139).

## Workplace Violence Policy

Viacom, which owned CBS at all relevant times, had a strict policy against workplace

violence. The policy states:

Acts, threats of physical violence, including intimidation, harassment, and/or coercion, which involve or affect the Company or which occur on Viacom's property or which in any way stem from employment at Viacom will not be tolerated. Acts or threats of violence include contact that is sufficiently severe, offensive, or intimidating to alter the employment conditions at Viacom or to create a hostile, abusive, or intimidating work environment for one or more Viacom employees.

(Def.'s 56.1 ¶ 37). Preston was not aware of any employee other than the Plaintiff who was

terminated from CBS for allegedly threatening physical violence. (Pl.'s 56.1(a)(3) ¶ 142). The

Plaintiff's coworkers testified that they heard other threats.

## Deposition Testimony of the Plaintiff's Co-Workers

Some of the individuals quoted in Schnecke and Preston's summary testified during

depositions that they were wrongly quoted, or that their statements were taken out of context:

11

- After reviewing Preston and Schnecke's summary of her interview, Newcomb testified that the summary took Newcomb's comment out of context. (Pl.'s 56.1(a)(3) ¶ 122).

- At his deposition, Chesney testified that no one ever told him that the Plaintiff threatened to come to work with an Uzi. (Pl.'s 56.1(a)(3) ¶ 125). During his deposition, Chesney stated that Preston did not question him directly regarding the Plaintiff's making a threat and only asked if he had been threatened in the workplace. (Pl.'s 56.1(a)(3) ¶ 125). When reviewing Preston's interview summary at his deposition, Chesney testified that he did not recall ever stating that the rumor is that the Plaintiff made the statement regarding the Uzi, and Chesney viewed the summary as a stronger interpretation of his comments during the meeting than what was said. (Pl.'s 56.1(a)(3) ¶ 125). With respect to the second meeting that Chesney had with Schnecke, Chesney said that he went to Schnecke's office to further clarify his remarks and to convey to Schnecke that most of the long-term employees of the company have been "a pretty decent group of employees" over the years. (Pl.'s 56.1(a)(3) ¶¶ 125-126). After reviewing this summary, Chesney disputed that Schnecke accurately quoted what Chesney expressed to Schnecke in the second meeting. (Pl.'s 56.1(a)(3) ¶ 127).

- Barcena testified that the Plaintiff can be high strung due to work becoming overbearing and that the Plaintiff does not become any more high strung than anyone else. (Pl.'s 56.1(a)(3) ¶ 128). Barcena testified that he did not recall

12

advising Preston that the Plaintiff becomes easily aggravated. (Pl.'s 56.1(a)(3) ¶ 128).

During depositions, some of the Plaintiff's coworkers testified favorably about the Plaintiff:

- Newman testified at her deposition that the Plaintiff "has a heart of gold" and that the Plaintiff brought her a medal blessed at the 9/11 site for Christmas. (Pl.'s 56.1(a)(3) ¶ 122). Newcomb testified that she never heard the Plaintiff state that he would cause harm to any employees at CBS, and she never perceived that the Plaintiff would cause harm to any employees at CBS. (Pl.'s 56.1(a)(3) ¶ 122).

- Chesney testified that he advised Schnecke that "the longer you've known somebody, you have different insights into what their day-to-day behavior is like" and that there was "a lot of stormy weather" with every management change and that he witnessed various degrees of reactions to these changes. (Pl.'s 56.1(a)(3) ¶ 126).

- Carlos Monge has worked for CBS since 1979 and worked directly with the Plaintiff during the early 1980s; based on Monge's interactions with the Plaintiff throughout the years, Monge testified that he had no reason to be afraid of the Plaintiff and was not aware of any employee who possessed such a fear. (Pl.'s 56.1(a)(3) ¶ 104).

- Throughout the approximately six years that Al Barcena worked with the Plaintiff in the media room, Barcena had no reason to believe that the Plaintiff would cause physical harm to another employee. (Pl.'s 56.1(a)(3) ¶ 105).

- Don Johnson worked with the Plaintiff on a daily basis in 2004 and had no reason to believe that the Plaintiff would harm another employee, even when the Plaintiff would express his anger and frustration at work. (Pl.'s 56.1(a)(3) ¶ 106).

The Plaintiff's coworkers also testified that other employees at CBS expressed frustration verbally:

- Sandy Newcomb testified that she heard other technicians and supervisors at CBS make threatening remarks directed at management under circumstances of "blowing off steam" approximately once every six weeks over the course of the last two years. (Pl.'s 56.1(a)(3) ¶ 143). Including hearing statements such as "I'm just going to blow this place up," "I could kill you," and "I could shoot you." (Pl.'s 56.1(a)(3) ¶ 143).

- In either 2001 or 2002, in response to a producer's telling Al Barcena that he did not know his job, Barcena told the producer that he would "rip his head off and wipe his butt with it." (Pl.'s 56.1(a)(3) ¶ 144).

- Carlos Monge, an editor, testified that he has heard employees at CBS jokingly threaten to cause bodily harm to other employees on a regular basis, such as "whoop you" and "you're a dead man." (Pl.'s 56.1(a)(3) ¶ 145). Monge also testified that on a frequent basis, and as recently as 2005, Monge has heard comments such as "I could kill this person" and "I could strangle them," referring to other employees. (Pl.'s 56.1(a)(3) ¶ 145). Monge testified that he does not think that management heard these "jokes." (Def.'s Resp. to Pl.'s 56.1(a)(3) ¶ 145).

14

- Don Johnson testified that he has heard producers and directors at CBS make comments caused by frustration that could be construed as a threat of physical violence on a monthly basis. (Pl.'s 56.1(a)(3) ¶ 146).

- Don Johnson and Carlos Monge testified that on May 4, 2005, Joe Hoffman, director of the morning show, made the following statement on the headphone circuit: "I'm a director. If you get in my way, I can shoot you and I will." (Pl.'s 56.1(a)(3) ¶ 147). No one reported to management that the alleged remarks were made." (Pl.'s 56.1(a)(3) ¶ 148).

- Don Johnson testified that as recent as July 2005, Don Johnson and Jim Knowlton reported to Tom Schnecke, Corrice Collins, and Mike Wilken that Rick Moser, central control supervisor, threatened to shove Johnson into a glass wall. (Pl.'s 56.1(a)(3) ¶ 147). Johnson testified that after speaking with Moser, Schnecke advised Johnson that due to Moser's denial of making the comment, Schnecke could not take any action in response to Johnson's complaint.

## LEGAL STANDARD

Summary judgment is appropriate under Rule 56 (c) when no genuine issue of material fact exists or when, drawing all factual inferences in favor of the nonmoving party, no "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (*Anderson*); *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999); *Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.*, 40 F.3d 146, 150 (7th Cir. 1994). Disputed facts are material when they might affect the outcome of the suit. *First Ind. Bank v. Baker*, 957 F.2d 506, 507-08 (7th Cir. 1992).

15

One of the "principal purposes" of awarding summary judgment is to "isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (*Celotex*). Thus, although the moving party on a motion for summary judgment is responsible for demonstrating to the court that there is no genuine issue of material fact, the non-moving party must go beyond the face of the pleadings, affidavits, depositions, answers to interrogatories, and admissions on file to demonstrate, through specific evidence, that a genuine issue of material fact exists and to show that a rational jury could return a verdict in the non-moving party's favor. *Celotex*, 477 U.S. at 322-27; *Anderson*, 477 U.S. at 254-56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994).

## ANALYSIS

### *Discrimination Based Upon the ADEA*

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).

A plaintiff in an age discrimination case may prove discrimination by presenting either direct or circumstantial evidence. *Adreani v. First Colonial Bankshares Corp.*, 154 F.3d 389, 393 (7th Cir. 1998). Direct evidence usually requires an admission by the decision maker that his actions were based on age. *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). Here, the Plaintiff admitted he never heard CBS's General Manager, Joe Ahern, or other managers make any discriminatory remarks about older employees. Thus, because the Plaintiff

16

offers no direct evidence of age discrimination, his ADEA claims are governed by the indirect, burden-shifting method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 492, 802 (1973) (*McDonnell Douglas*). *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000) (*Reeves*) (noting that *McDonnell Douglas* framework applies in ADEA cases when parties do not dispute it).

The burden-shifting analysis requires the Plaintiff to first establish a *prima facie* case of discrimination. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089 (1981). If a plaintiff meets this showing, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment action. *Stockett v. Munchie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000). At this stage, an employer "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 257 (1981) (*Burdine*). Once the defendant meets this burden of production, the burden shifts back to a plaintiff to show that an employer's proffered reason is pretextual.

### Prima Facie Case

Under the *McDonnell Douglas* burden-shifting analysis, the plaintiff must first establish a *prima facie* case of age discrimination. *Mills v. First Federal Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833, 840 (7th Cir. 1996). To establish a *prima facie* case, a plaintiff must demonstrate that he: (1) was in the protected age group, (2) was performing his job satisfactorily, (3) suffered an adverse employment action, and (4) was replaced by a similarly situated individual outside the protected class. *McDonnell Douglas*, 411 U.S. at 802. The Defendant contests the second

17

prong of the Plaintiff's *prima facie* case. In order to make out the second prong of a *prima facie* case, the Plaintiff must show that he was "performing his job well enough to meet his employer's legitimate expectations." *Baxter Healthcare*, 13 F.3d at 1122.

The Plaintiff bears the burden of establishing that he was meeting his employers' legitimate job expectations, but the Plaintiff failed to do so. The Plaintiff's direct supervisor, Corrice Collins, testified that the Plaintiff made mistakes at a "far greater" rate than other technicians. (Def's 56.1 ¶ 26). Collins' computer contained eighteen emails related to the Plaintiff, which reported that the Plaintiff repeatedly missed feeds of major programs. (Def.'s 56.1 ¶ 26-30). One email sent from Collins referred to the Plaintiff's "failure to do his job" and "his serious lack of attention to his job." (Def.'s 56.1 ¶ 32). During this time period, the Plaintiff's supervisors referred to his work as "unacceptable" and "beyond unacceptable." (Def.'s 56.1 ¶ 31). The Plaintiff asserts that he is able to establish that he was meeting legitimate expectations because he was terminated for reasons other than performance. Courts have uniformly held that an employee's failure to show that he was meeting his employer's legitimate expectations prior to discharge is fatal to an ADEA claim, regardless of whether or not the employee was terminated for deficiencies in performance. In *Alexander v. CCT Technology Financing Services, Inc.*, 217 F. Supp.2d 867 (N.D. Il. 2002), a plaintiff's failure to show that she was meeting her employer's reasonable job expectations meant that she failed to make a *prima facie* case for age discrimination, even though her employer maintained that the reason for her discharge was her profane confrontations with and threats to a supervisor.

### Legitimate Non-Discriminatory Reason for Discrimination and Pretext

Assuming *arguendo* that the Plaintiff was shown to be qualified and satisfied the *McDonnell Douglas* criteria for a *prima facie* showing of discrimination based on age, the Defendant is afforded the opportunity to articulate a legitimate, non-discriminatory reason for the Plaintiff's termination. If so, the burden shifts back to the Plaintiff, who must then offer evidence that the Defendant's articulated reason was merely a pretext for discrimination.

The Defendant asserts the sole, non-discriminatory reason is the knowledge of the Plaintiff's threat to bring an Uzi to work and act violently. Knowledge of a plaintiff's threat of violence is a legitimate reason for an employee's termination. *See Thomas v. Habitat Co.*, 213 F. Supp.2d 887, 895 (N.D. Ill. 2002). Thus, the Plaintiff must produce specific factual evidence that CBS's proffered reason for terminating him was a pretext for its true reason for firing the Plaintiff, his age.

To show a pretext, a plaintiff must do more than demonstrate that the employer made a mistake or that the employer's reason was not good enough to support its decision. *Reeves*, 530 U.S. at 147. A plaintiff must provide "evidence tending to prove that the employer's reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate the discharge," *Testerman v. EDS Technical Prods. Corp.*, 98 F.3d 297, 303 (7th Cir.1996) (citation omitted), and that the plaintiff would not have been let go but for his age. *Burdine*, 450 U.S. at 256. Under the *McDonnell Douglas* analysis, a pretext is "a phony reason that the employer offers for engaging in discriminatory conduct." *Mills*, 797 F.3d at 845. "Pretext exists where the ostensible reason for the employment decision is really a lie contrived to mask unlawful discrimination." *Little v. Illinois Dep't of Revenue*, 369 F.3d 1007, 1012 (7th

Cir. 2004). The Seventh Circuit adheres to the honest-belief rule: even if the business decision was ill-considered or unreasonable, provided that the decision maker honestly believed the nondiscriminatory reason he gave for the action, pretext does not exist. *Crim v. Board of Education of Cairo Sch. Dist. No. 1*, 147 F.3d 535, 541 (7th Cir. 1998).

The undisputed material facts demonstrate that the Plaintiff was terminated for reportedly making the threats of violence with a firearm – regardless of whether the Plaintiff in fact made the statements, intended them to be threats, or intended to commit violent acts with a firearm. CBS's belief that the Plaintiff made the threats to use an Uzi at work was reasonable: Linda Peltier first reported the threat to Corrice Collins in an email, which stated that on at least three occasions the Plaintiff mentioned to Peltier that he could "come in to work with an uzie [sic] and go postal." Although Peltier indicated that she hoped that the Plaintiff did not actually intend to carry out the threat, she wrote that it was "difficult for me to know the seriousness of his comments." CBS then conducted an investigation. During this investigation, more than one of the Plaintiff's coworkers reported hearing the Plaintiff threaten to bring his Uzi to work and "go postal." Further, CBS management learned that the Plaintiff owned an Uzi. The investigation also revealed that the Plaintiff was angry and that those feelings were escalating.

The Plaintiff argues that coworkers claimed that the statements they made during the investigation were exaggerated or taken out of context by Preston and Schnecke's summary of the investigation and that the Plaintiff's alleged threats, taken in the light most favorable to the Plaintiff, may have been made in jest. However, the Court is not a super-personnel department that sits in judgment of the wisdom of an employer's employment decisions, *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 532 (7th Cir.2003), rather, the Court must determine whether the

20

evidence, viewed in the light most favorable to the non-moving party, would raise a question as

to whether the purported threats were not the true reason for the Plaintiff's termination. *See e.g.,*

*Appelbaum v. Milwaukee Metropolitan Sewerage Dist.*, 340 F.3d 573, 579 (7th Cir. 2003). Here,

the Plaintiff failed to meet this burden.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment is granted.

Dated: August 31, 2006

JOHN W. DARRAH
United States District Court Judge

21